UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MINA SEDAROUS,

      Plaintiff,

v.                                                            Civil Case No. 2:19-cv-12525
                                                              Honorable Linda V. Parker
HENRY FORD HEALTH SYSTEM
d/b/a HENRY FORD HOSPITAL,

      Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 39)

Plaintiff Mina Sedarous initiated this lawsuit against Defendant Henry Ford Health System ("Henry Ford Health"), averring that Defendant terminated Plaintiff's employment as a pharmacy supervisor because of his wrist injury and in retaliation for his request to work from home as a result of the injury.  In his Complaint, Plaintiff alleged (i) disability discrimination in violation of the Americans with Disabilities Act ("ADA") and the Michigan's Persons with Disabilities Civil Rights Act ("PDCRA"); (ii) retaliation in violation of the ADA; and (iii) intentional infliction of emotional distress.[1]  (ECF No. 1 at Pg. ID 3-7.)

_____

[1] The Court dismissed Plaintiff's intentional infliction of emotional distress claim in a July 27, 2020 Opinion & Order.  (ECF No. 34.)

Currently before the Court is Defendant's Motion for Summary Judgment. (ECF No. 39.) The motion has been fully briefed. (ECF Nos. 45, 47.) For the reasons that follow, the Court grants Defendant's motion.

## BACKGROUND

Henry Ford Health employed Plaintiff as a pharmacist, and later as a pharmacy supervisor, beginning in 2008 until March 5, 2019. (*See* Sedarous Dep. at 14-17, ECF No. 39-3 at Pg. ID 199-200.) As a pharmacy supervisor, Plaintiff ran the day-to-day operations of two of Defendant's ambulatory pharmacies. (*See* Job Description, ECF No. 39-2.) Between the two facilities, Plaintiff supervised up to approximately 40 pharmacists and pharmacy technicians. (Sedarous Dep. at 15-16, ECF No. 39-3 at Pg. ID 199.)

According to Plaintiff, sometime before July 2018, he and another pharmacy supervisor, Heidi Schultz, had a falling out.[2] (ECF No. 45 at Pg. ID 1603; *see* Termination Tr. at 12-13, ECF No. 39-7 at Pg. ID 462-63.) In May 2018, Schultz was promoted to interim manager of certain pharmacy supervisors, including Plaintiff. (*See* Schultz Dep. at 10-11, ECF No. 39-5 at Pg. ID 341.) In July 2018,

---

[2] In Response to the Motion for Summary Judgment, Plaintiff asserts that, after the working relationship soured, Schultz began "acting passive-aggressively towards him." (Resp. Br., ECF No. 45 at Pg. ID 1603.) Plaintiff cites to no part of the record supporting this assertion. *See* Fed. R. Civ. P. 56(c)(1) (establishing that the nonmoving party has an affirmative duty to identify specific portions of the record upon which it seeks to rely to create a genuine issue of material fact).

Schultz was hired into the permanent manager position.  (*Id.*)  Prior to July 2018, no manager or pharmacy supervisor complained to HR about Plaintiff.  (*See* Bowman Dep. at 45-46, ECF No. 45-17 at Pg. ID 2626-27; Sandburn Dep. at 42-43, ECF No. 45-18 at Pg. ID 2687-88.)

On July 9, 2018, after reviewing records in the timekeeping system, Schultz forwarded Plaintiff an email asking why he worked four days a week, 10 hours a day.  (7/9/18 Emails, ECF No. 39-6 at Pg. ID 403.)  Schultz further stated that "[n]one of the other [s]upervisors are scheduled that way and the only reason coordinators have that option is because they are on-line pharmacists."  (*Id.*)  In response to Schultz's email, Plaintiff explained that his schedule was based on the unique needs of the high-volume pharmacies for which he was responsible and that "[t]hat schedule ha[d] been in place for years."  (*Id.* at Pg. ID 404.)  Plaintiff also asserts that it is not true that other supervisors did not maintain a similar schedule. (ECF No. 45 at Pg. ID 1604 (citing Kronos Time Details, ECF No. 45-6); 5/19/21 Motion Hearing.)  Schultz then emailed a human resources representative to seek clarification about the rules and policy regarding supervisor schedules.  (7/10/18 Emails, ECF No. 45-7 at Pg. ID 2059.)  The representative informed Schultz that Plaintiff's schedule was based on the business needs of the departments and, "[b]ased on the ambulatory pharmacy department needs . . ., it sounds like [a]

[supervisor] should be working Monday – Friday on a regular basis." (*Id.* at Pg. ID 2060.)

On July 23, 2018, Schultz emailed Plaintiff to inform him that, per a conversation she had with Dan Kus—Schultz's supervisor—Plaintiff was to work five days a week. (7/23/18 & 7/24/18 Emails, ECF No. 39-6.) Schultz further explained that Plaintiff's "main job [was] to manage [his] staff at both sites and run [his] business." (*Id.*) In the same email, Schultz also inquired as to Plaintiff's whereabouts the preceding Thursday, July 18, 2018, when she visited his pharmacies during business hours and found he was not there. (*Id.*) Plaintiff responded, stating that he was at one of the pharmacy sites on July 18 for "an hour or so" after Schultz left. (*Id.* at Pg. ID 409.) Plaintiff also asked, "Am I in trouble or under investigation? I need to know please ☺." (*Id.*) Schultz did not respond to Plaintiff's question and, after this email exchange, Plaintiff began logging time records that reflected work on five days a week, eight hours a day. (ECF No. 45 at Pg. ID 1605 (citing Kronos Time Detail, ECF No. 45-10; Schultz Dep. at 45-46, ECF No. 39-5 at Pg. ID 349-50).)

On January 5, 2019, Plaintiff forwarded Schultz an email requesting, among other things, to work "4 long days on some weeks." (1/5/19 & 1/7/19 Emails, ECF No. 39-6 at Pg. ID 411.) Plaintiff stated:

> I trust you would think it over from a business perspective.
> I am not asking for a special treatment or deviation from

4

> any rules.  I want to continue to do the best for my sites
> meanwhile I do not want to risk losing my job or find
> myself in a position I have to keep explaining what I do or
> the fluctuating hours I work to match the need of my
> business over and over.

(*Id.*)

Though Plaintiff testified that Schultz was not clear about a requirement to

be *physically* present at the pharmacies during the work week (Sedarous Dep. at

64-70, ECF No. 39-3 at Pg. ID 211-13), Schultz responded to Plaintiff's email,

stating:  "Routinely, you are expected to work five days per week and use PTO on

days you are not on site working.  If you need to hire additional Pharmacist

coverage to help with workflow, I am in complete agreement.  Let me know if I

answered all of your questions or if you need clarification."  (1/5/19 & 1/7/19

Emails, ECF No. 39-6 at Pg. ID 412.)

On January 24, 2019, Plaintiff broke his right wrist during an accident

unrelated to his job duties.  (Sedarous Dep. at 18-19, ECF No. 39-3 at Pg. ID 200.)

In his Complaint, Plaintiff alleges that "[t]his injury caused [him] to be unable to

perform manual tasks and work; to wit, he could not drive, and this restriction

impaired his ability to work."  (Compl. ¶ 9, ECF No. 1 at Pg. ID 2.)  Plaintiff

received a doctor's note, which states in relevant part:  "[p]lease allow patient to

work remotely from home for the next 3 weeks as much as he can tolerate." (ECF No. 19 at Pg. ID 110.)

On January 28, 2019, Plaintiff forwarded the doctor's note to Schultz and notified her of his intention to go into work on the days that his son could drive him. (1/28/19 & 1/29/19 Emails, ECF No. 39-6 at Pg. ID 422.) Schultz responded on the same day, stating:

> [W]hat kind of timeframe are we talking about? How many days a week? I will need to evaluate and get approval from [Kus]. The alternative would be to get some pharmacist help for you. Please outline for me how many days a week I would need to cover for you if [Kus] doesn't approve you working from home. Also outline what you would be doing at home.

(*Id.* at Pg. ID 425.) Plaintiff did not immediately respond. The next morning, Schultz sent a follow-up email to Plaintiff, asking him to "provide input regarding the questions" she asked "[i]n order to get [Kus] and HR's approval for [him] to work from home." (*Id.* at Pg. ID 426.) Plaintiff responded and explained that he was reluctant to take time off because one of the pharmacies he manages was in the middle of a move and there were many administrative tasks that needed to be completed beforehand. (Sedarous Dep. at 122-23, ECF No. 39-3 at Pg. ID 226.) Schultz emailed back, explaining that, "[d]ue to the nature of [his] role, [Defendant] [was] unable to accommodate [Plaintiff's] request to work from home." (1/28/19 & 1/29/19 Emails, ECF No. 39-6 at Pg. ID 428.) Schultz noted

that "preparing for the move out" "[could] be put on temporary hold." (*Id.*)

Schultz suggested that, if he could not work, Plaintiff request a medical leave of

absence. (*Id.*) Schultz also suggested that, if he could work, Plaintiff find a ride to

work via a family member or cab, and she would "provide some assistance with

the things [he] may need extra help with." (*Id.*) "[L]et me know what your plan

will be. . . . If you choose to continue working, let's meet to talk about how I can

help," Schultz concluded. (*Id.*) Plaintiff never responded. (*See id.*; Sedarous Dep.

at 124-25, ECF No. 39-3 at Pg. ID 226-27.)

Approximately one week later, on February 6, the weather was reported as

snowy with icy conditions. On that day, Defendant forwarded an email

encouraging employees to "use [their] best judgment in consultation with [their]

leader about how and where [they] work[ed] [that day], including from home if

possible." (2/6/19 Email, ECF No. 45-14 at Pg. ID 2324-25.) The email further

noted that "[i]f the team member fails to communicate with their leader, it could

result in an occurrence for their attendance."[3] (*Id.*) The record suggests that it also

snowed on February 7 and 13, though it does not appear Defendant forwarded a

similar email to its employees regarding those dates.

---

[3] An "occurrence" is a documented instance of an employee violating an
employer's attendance policy. (5/19/21 Motion Hearing.)

Plaintiff worked from home on each of the three days—February 6, 7, and 13—and points out that he texted Schultz on February 13, stating that he would not be coming into work due to the bad road conditions.  (Feb. Texts, ECF No. 39-6 at Pg. ID 432.)  Schultz did not immediately receive Plaintiff's text message because, as Plaintiff knew (Sedarous Dep. at 89-90, ECF No. 39-3 at Pg. ID 301-02), she was vacationing in Mexico at the time (Schultz Dep. at 58-59, ECF No. 39-5 at Pg. ID 353).  When Schultz returned from Mexico, she reviewed timecards and asked Plaintiff if he came into work on February 13 or if he needed PTO for that day.  (Feb. Texts, ECF No. 39-6 at Pg. ID 433.)  After Plaintiff stated that he worked from home, Schultz informed him that she "[cannot] approve [the] hours [he] worked from home" because, as "[they] already discussed," "[Kus] and HR will not allow [her] to approve working remotely."  (*Id.*)  Schultz did not respond to Plaintiff's request that she "consider the extra hours [he] worked on the other days to cover for [February 13]."  (*Id.*)  After reviewing additional time records, the pharmacies' camera systems, and swipe card records, Schultz determined that Plaintiff had not been physically present on February 6 or 7 as well.  (Schultz Dep. at 124-25, ECF No. 39-5 at Pg. ID 369.)  Schultz testified that Plaintiff "didn't communicate [] by email, by text, or verbally that those were days he did not work until [she] questioned him if he did work."  (*Id.*)

Plaintiff states that he "would have driven to work if he had not been injured or had a ride from a family member on those days, however, as a result of his injury [Plaintiff] could not drive to work under those conditions nor were his family members available to drive him." (Resp. Br., ECF No. 45 at Pg. ID 1606-07; *see* Sedarous Dep. at 162-64, ECF No. 39-3 at Pg. ID 236.) Schultz also testified that she had a conversation with Plaintiff after February 13, in which Plaintiff "said he was going to come to work, and there [were] definitely days even after [] that he didn't show up for work." (Schultz Dep. at 124, ECF No. 39-5 at Pg. ID 369.) In addition, employees told Schultz of times when Plaintiff was not present at the pharmacies. (*Id.* at 115-16, Pg. ID 367.)

Schultz had other concerns regarding Plaintiff as well. Around January 2, 2019, upon reviewing Plaintiff's mileage reimbursement requests, Schultz learned that Plaintiff was billing for travel from home-to-site and site-to-home, instead of trips from site-to-site only. (1/2/19, 1/5/19, & 1/7/19 Emails, ECF No. 39-6 at Pg. ID 414-16.) Plaintiff explained that previous managers permitted such reimbursements. (*Id.* at Pg. ID 415.) In response, Schultz provided Plaintiff with a copy of Defendant's mileage reimbursement policy, told him that she would reimburse only those trips between work sites, and noted that—"regardless of what [a manager] told [him] previously"—"going forward the guidelines must be followed consistently." (*Id.* at Pg. ID 416.) Plaintiff requested that Schultz

9

reconsider, explaining that "$2,500 [was] too much money for [him] to lose" because "[he] was really relying on that to cover [h]oliday expenses" and asking if the "new rules" could take effect beginning in March.  (*Id.* at Pg. ID 418.)  Schultz responded:  "[T]he [] guidelines for mileage reimbursement [] need to be followed now.  Not beginning in March."  (*Id.* at Pg. ID 420.)

Schultz further testified that Plaintiff did not show up to mandatory meetings.  (Schultz Dep. at 115-16, ECF No. 39-5 at Pg. ID 367; *see also* Feb. Texts, ECF No. 39-6 at Pg. ID 437.)

Schultz brought her concerns to the attention of Kus and HR over the course of the eight months that followed her initial discussion with Plaintiff via her July 23, 2018 email.  (*See e.g.*, 7/23/18 & 7/24/18 Emails, ECF No. 39-6; 1/2/19, 1/5/19, & 1/7/19 Emails, ECF No. 39-6 at Pg. ID 420; 1/28/19 & 1/29/19 Emails, ECF No. 39-6 at Pg. ID 428.)  On March 4, 2019, Kus and Schultz met with Plaintiff and told him that he was fired.  (*See* Termination Tr., ECF No. 39-7.)  Kus and Schultz cited "the mileage issue" and, in response to allegations that Plaintiff continued to work from home "[r]egardless of what [they]'ve talked about or what [they]'ve said," continued to "not [be] physically present in [his] pharmacies five days a week," and continued to not "abide [by] the rules and the policies and procedures."  In response, Plaintiff stated that "[he] will stop that," committed to "abide by every . . . single rule," explained that "[he] need[ed] another chance,"

and asked to be demoted.  (Termination Tr., ECF No. 39-7 at Pg. ID 463-65, 13:1-21, 15:5-21, 17:24-18:5, 18:17-20:9, 21:15-22:6; *see also* ECF No. 39-7 at Pg. ID 460-66, 2:4-6:21, 8:1-9:4, 10:20-11:1, 11:24-12:2, 13:1-7, 13:22-14:7, 15:5-8, 15:25-16:4, 19:25-20:9, 25:3-22.)  The termination of Plaintiff's employment was effective as of March 5, 2019.  (Schultz Dep. at 101, ECF No. 39-5 at Pg. ID 363; Sedarous Dep. at 175, ECF No. 39-3 at Pg. ID 239.)

## LEGAL STANDARD

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a

genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). Notably, the trial court is not required to construct a party's argument from the record or search out facts from the record supporting those arguments. *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied* 494 U.S. 1091 (1990) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire

record for some specific facts that might support the nonmoving party's claim."). Rather, the parties are required to designate with specificity the portions of the record such that the court can "readily identify the facts upon which the . . . party relies[.]" *InterRoyal Corp.*, 889 F.2d at 111.

## APPLICABLE LAW & ANALYSIS

### <u>Disability Discrimination</u>

"The ADA prohibits employers from discriminating against qualified individuals with disabilities in regard to hiring, advancement, discharge, or other terms, conditions, or privileges of employment." *Manigan v. Sw. Ohio Reg'l Transit Auth.*, 385 F. App'x 472, 475 (6th Cir. 2010) (quoting *Bratten v. SSI Servs., Inc*., 185 F.3d 625, 632 (6th Cir. 1999)). "[T]he [ADA] . . . and the PWDCRA share the same purpose and use similar definitions and analyses, and [Michigan state] courts have relied on the ADA in interpreting the PWDCRA." *Anderson v. Detroit Transp. Corp.*, 435 F. Supp.3d 783, 798 (E.D. Mich. 2020) (alterations in original) (quoting *Chiles v. Mach. Shop, Inc.*, 606 N.W.2d 398, 405 (Mich. Ct. App. 1999)).

"To prove a prima facie case of disability discrimination, a plaintiff must show that (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without an accommodation, and (3) he suffered an adverse employment action because of his disability." *Demyanovich v. Cadon*

13

*Plating & Coatings, LLC*, 747 F.3d 419, 433 (6th Cir. 2014) (citing *Talley v.*

*Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008)).

If a plaintiff makes out a prima facie case, the burden shifts to the employer

to produce a legitimate, non-retaliatory reason for its action. *Hamilton v. Gen.*

*Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009). In this case, Defendant argues that

"Plaintiff was terminated for months of disobedience to his manager's directives

that he *be at work* during regular business hours," not because of his alleged

disability. (MSJ, ECF No. 39 at Pg. ID 185 (emphasis in original).) With this

explanation, the burden would shift back to Plaintiff to put forward competent

evidence from which a reasonable jury could conclude that the stated reason is

merely pretextual. *Hamilton*, 556 F.3d at 435. Here, the Court need not decide

whether Plaintiff has established that genuine issues of material fact exist as to his

prima facie case because, even if Plaintiff managed to overcome that hurdle, his

disability discrimination fails as to pretext.

A plaintiff may establish pretext "by showing that the employer's proffered

reasons (1) have no basis in fact; (2) did not actually motivate the adverse action;

or (3) were insufficient to explain the adverse action." *Kirkland v. James*, 657 F.

App'x 580, 586 (6th Cir. 2016) (citation omitted). "[A]t bottom the question is

always whether the employer made up its stated reason to conceal intentional

[discrimination]." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)

(quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)).

<u>*(A) Did Defendant's Reason Have a "Basis in Fact"?*</u>

The first type of rebuttal generally "consists of evidence that the reasons

given by the employer simply did not happen." *Lawroski v. Nationwide Mut. Ins.

Co.*, 570 F. App'x 589, 594 (6th Cir. 2014) (quoting *Peters v. Lincoln Elec. Co.*,

285 F.3d 456, 471 (6th Cir. 2002)).

Plaintiff denies "not [being] on site during regular business hours" after the

July 2018 conversation with Schultz.  (ECF No. 45 at Pg. ID 1624 (citing Sedarous

Dep. at 63-64, ECF No. 39-3 at Pg. ID 211-12).)  Plaintiff argues that (i) "the

evidence that Defendants have produced"—specifically, "Plaintiff's Kronos

payroll records and his badge swipes"—"are not proof that Plaintiff was not at

work when he said that he was"; (ii) "although [] Schultz claims that she checked

the video recordings of Plaintiff's pharmacy in accordance with her supposed

investigation, Defendants have not produced those video recordings"; and (iii)

"neither [] Kus nor any HR employee verified and viewed the alleged video

recordings which allegedly show Plaintiff absent from work."  (ECF No. 45 at Pg.

ID 1624 (citing Kus Dep., ECF No. 39-4 at Pg. ID 289; Shultz Dep., ECF No. 39-5

at Pg. ID 358).)  The Court addresses each of these arguments in turn.

First, Plaintiff's contention that the "Kronos payroll records and his badge swipes" do not serve as "proof that Plaintiff was not at work when he said that he was" is unpersuasive because the Sixth Circuit "do[es] not require that the decisional process used by the employer be optimal or that it [leaves] no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). Under the Sixth Circuit's "modified honest belief" rule, the Court considers the information available to the defendant at the time it made its termination decision:

> [The] "modified honest belief" rule [] provides that "'for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" *Escher v. BWXT Y–12, LLC*, 627 F.3d 1020, 1030 (6th Cir. 2010) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006)). The employee, in turn, "must be afforded the opportunity to produce evidence to the contrary, such as an error on the part of the employer that is 'too obvious to be unintentional.'" *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 286 (6th Cir. 2012) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). To overcome the employer's invocation of the honest belief rule, the employee "must allege more than a dispute over the facts upon which [the] discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).

*Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012). Ultimately, "[w]hen an employer reasonably and honestly relies on particularized facts in

16

making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen*, 580 F.3d at 401 (quoting *Clay v. United Parcel Serv., Inc*., 501 F.3d 695, 713-15 (6th Cir. 2007)).

Plaintiff has failed to produce any evidence demonstrating that Defendant unreasonably relied on the facts before it at the time of the decision.  These facts include information gathered from time records, badge swipe records, the pharmacies' camera systems, and Plaintiff's own admissions via text and email. The insufficient evidence of pretext contrasts starkly with the substantial evidence that Defendant had a "reasonably informed and considered" reason to believe that Plaintiff was, at a minimum, not showing up to work sites.  *Smith*, 155 F.3d at 807; *see also Majewski v. Automatic Data Processing, Inc*., 274 F.3d 1106, 1116 (6th Cir. 2001).  Indeed, where—as here—an employer acts on a good faith belief that the employee committed the conduct that served as the grounds for termination, the plaintiff cannot defeat summary judgment by simply arguing that he did not engage in the alleged conduct.  *Braithwaite*, 258 F.3d at 494 (explaining that the employee "must allege more than a dispute over the facts upon which [the] discharge was based" in order "to overcome the employer's invocation of the honest belief rule").

Second, Schultz's testimony that she reviewed the camera footage of Plaintiff's pharmacies—made under oath during her deposition—amounts to evidence sufficient to support Defendant's argument that Plaintiff was not always on-site as required. (*See* Schultz Dep. at 80-81, 115, ECF No. 39-5 at Pg. ID 358 367.) It is then Plaintiff's responsibility to come forward with specific evidence showing that there is a genuine issue regarding whether Schultz actually reviewed the recording, which could arguably establish an issue as to whether Defendant "honestly believe[d]" in the proffered non-discriminatory reason for its adverse employment action. Plaintiff, however, fails to produce any evidence contradicting Schultz's testimony.

Finally, Plaintiff does not explain why it matters whether "Kus [or] any HR employee verified and viewed the alleged video recordings" themselves. Kus reviewed other evidence, such as Plaintiff's time records and badge swipes. (*See e.g.*, Kus Dep. at 80, ECF No. 39-4 at Pg. ID 299.)   The fact that Schultz, as one of the three decisionmakers, reviewed the video recordings and reported her findings back to the others does not suggest that Schultz's conclusion that Plaintiff was not physically present on-site on some days is incorrect. *Smith*, 155 F.3d at 807 (stating that the employer's "decisional process" does not need to be "optimal" or "[leave] no stone unturned").

18

In the end, Plaintiff fails to show that Defendant did not honestly believe the facts underlying the termination decision.  For the foregoing reasons, the claim that Defendant's reason had "no basis in fact" fails.

### (B) Did Defendant's Reason Actually Motivate the Adverse Action?

"[T]he second type of rebuttal of pretext—that a defendant's proffered reasons did not actually motivate its action—'is of an entirely different ilk' than the other types." *Lawroski*, 570 F. App'x at 595 (quoting *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 396 (6th Cir. 2008)).

> Any endeavor to establish this type of rebuttal is based upon an admission of "the factual basis underlying the employer's proffered explanation and further [admission] that [those facts] *could* motivate" the adverse employment action. *Mischer v. Erie Housing Auth.*, 168 Fed. Appx. 709, 715 (6th Cir. 2006) (internal quotation marks omitted).  To attempt to "indict the credibility of the employer's explanation," the plaintiff normally offers circumstantial evidence that "tend[s] to prove that an illegal motivation was *more* likely than that offered by the defendant." *Id.* (internal quotation marks omitted).

*Id.* (emphasis in original).

In other words, to establish pretext using the second type of rebuttal, Plaintiff concedes that he, at a minimum, failed to show up on-site as expected and that this could have motivated Defendant to fire him.  Plaintiff points to Schultz's personal dislike for him as the more likely motivation for the termination decision, asserting that "[her] investigations into Plaintiff's scheduling practices and

attendance, and her purposeful corralling of other [] employees with the purpose of turning them against Plaintiff, were all motivated by her negative feelings towards Plaintiff stemming from personal comments he made about her."  (Resp. Br., ECF No. 45 at Pg. ID 1625-27.)  Ultimately, Plaintiff argues, "[Schultz]'s unclean hands, personal bias and animus against Plaintiff, serve to discredit her allegations against Plaintiff and detracts from Defendant[']s proffered legitimate non-discriminatory reason for his termination, in favor of those reasons being pretextual."  (*Id.* at Pg. ID 1626-27.)

Even if true, it does not follow—or even suggest—that Defendant targeted Plaintiff based on the "illegal motivation" of disability discrimination.  Plaintiff's arguments, at most, assert that Defendant's articulated reason is pretext to mask Schultz's "negative feelings toward Plaintiff"—not pretext designed to mask disability discrimination.  *See Skelton v. Sara Lee Corp.*, 249 F. App'x 450, 462 (6th Cir. 2007).  As the Sixth Circuit has explained, "[i]f [the proffered reason] is not the true ground, the employer may still be innocent of discrimination; he may for example have lied to conceal a reason that was discreditable but not discriminatory."  *Chen*, 580 F.3d at 400 n.4 (second alteration in original) (quoting *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416 (7th Cir. 2006)); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason

was false, *and that discrimination was the real reason*."); *Barnett v. Dep't of Veteran Affairs*, 153 F.3d 338, 343 (6th Cir. 1998) (upholding the district court's determination that witness's statements describing how supervisor made it known that "he disliked the plaintiff and used her as the butt of office jokes, are consistent with personal dislike rather than discriminatory animus" and noting that "personal conflict does not equate with discriminatory animus"); *Seeger*, 681 F.3d at 278 n.2, 287 (finding no genuine issue of material fact as to whether an employer had an honest belief in its non-retaliatory reason for terminating a plaintiff even where the employer's decision rested on statements from other employees with known animus against the plaintiff).  None of the evidence presented by Plaintiff provides a basis upon which a reasonable jury could find that disability discrimination was more likely the reason for the termination of Plaintiff's employment than the reason offered by Defendant.  And even if consideration of Schultz's alleged personal dislike of Plaintiff played a role in the termination decision, Plaintiff points to no evidence suggesting that this personal animus was the product of Plaintiff's alleged disability.  *See Pierce v. Gen. Motors LLC*, No. 14-14491, 2016 WL 4800869, at *9 (E.D. Mich. Sept. 14, 2016), *aff'd*, 716 F. App'x 515 (6th Cir. 2017) ("Absent proof that Plaintiff's race engendered [the supervisor's] personal animosity, he fails to present evidence of unlawful discrimination.").

<u>(C) Was the Reason Insufficient to Explain the Adverse Action?</u>

Plaintiff proffers two arguments to support his contention that the reasons offered by Defendant were insufficient to explain the adverse action.

First, "if [Defendant's] policy was to allow employees to work from home during days of inclement weather, it could not have been unduly burdensome for Defendant[] to allow Plaintiff to work from home on those specific days he could not get a ride to work" and "[n]otably, the days when Plaintiff could not get a ride to work, which [] Schultz reported were the days that ultimately lead [sic] to Plaintiff's termination, were also inclement weather days." (Resp. Br., ECF No. 45 at Pg. ID 1627.) The problem with this argument is that Defendant did not allow employees to work from home generally during days of inclement weather and, when on February 16 an email went out informing employees of that possibility, they were instructed to consult "*with [their] leader* about how and where [they] work[ed] [that day.]" (2/6/19 Email, ECF No. 45-14 at Pg. ID 2324-25 (emphasis added).) The email further stated: "*If the team member fails to communicate with their leader, it could result in an occurrence for their attendance*." (*Id.*) Defendant shows—and Plaintiff does not dispute—that he failed to show up on-site on February 6 and 7, 2019. He did not inform Schultz, or any other supervisor, of his intention to be physically absent on those days. And Plaintiff admits that he informed Schultz of his February 13 absence via a text,

22

even though Plaintiff knew Schultz was on vacation in another country.  There is no genuine issue of material fact that, on at least February 6 and 7, Plaintiff violated the attendance directive outlined in the February 6, 2019 company-wide email and Plaintiff does not explain why these violations do not constitute sufficient grounds for the termination of his employment.  (5/19/21 Motion Hearing.)

Second, Plaintiff contends that "Defendant[] waited almost a year after [] Schultz first took issue with Plaintiff's alleged scheduling and attendance issues before taking action to terminate him."  (Resp. Br., ECF No. 45 at Pg. ID 1627.) "If the reasons proffered for Plaintiff's termination were not pretextual," Plaintiff argues, "Defendant[] would not have waited until March 2019 to terminate Plaintiff, as soon as Plaintiff became disabled."  (*Id*.)

It is disingenuous to suggest that some form of pretext evidence is established by the fact that Defendant chose not to fire Plaintiff immediately after Schultz uncovered his attendance issues in July 2018, choosing instead to engage Plaintiff in several conversations in July 2018 and January and February 2019 to remind Plaintiff of Defendant's expectations.  At several points throughout the eight-month period that preceded Plaintiff's firing, Plaintiff demonstrated an unwillingness to follow mandatory rules and policies.  This was corroborated by Plaintiff's request to continue flouting the mileage reimbursement policy for an

additional two months to cover his holiday expenses and Plaintiff's decision to not

work on-site on February 6, 7, and 13 despite notice that he must consult with his

supervisor before working from home on days of inclement weather and despite

Schultz previously making clear that working from home was not an option.[4]  As

Schultz testified:

> He would never listen to me.  He continued to challenge
> me about working from home.  He challenged me about
> his schedule.  He challenged me about not remembering
> the days he worked or the hours he worked or the times
> he worked. . . . He challenged me about his mileage.  He
> challenged me about anything we talked about, and he
> would say one thing and go and do whatever he wanted
> until I asked him the next question or caught him in the
> next lie.

(Schultz Dep. at 134-35, ECF No. 39-5 at Pg. ID 372.)  Absent a reason to doubt

the validity of these reports, Defendant was entitled to rely on this information

when deciding to terminate Plaintiff's employment and Plaintiff fails to explain

why this information was insufficient to support the adverse action.  *See Chen*, 580

F.3d at 401 (stating that an employer is entitled to summary judgment on pretext

when "the evidence [an employer] had at hand when it fired [an employee] . . .

indicated that [the employee's] work was not up to par").

---

[4] When asked during his deposition whether "anyone prior to February 13 and after
July 9[,] when [Schultz] was looking at the time records, ever mention[ed] to [him]
that working from home was not an option," Plaintiff responded, "Yeah, [Schultz]
might have."  (Sedarous Dep. at 181-82, ECF No. 39-3 at Pg. ID 241.)

Moreover, "[u]nlike its role in establishing a prima facie case, 'the law in [the Sixth] [C]ircuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Seeger*, 681 F.3d at 285 (quoting *Donald v. Sybra, Inc*., 667 F.3d 757, 763 (6th Cir. 2012)). "However, 'suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence.'" *Id.* (*Bell v. Prefix, Inc*., 321 F. App'x 423, 431 (6th Cir. 2009)). Here, however, there is no "other, independent evidence" of pretext for all the reasons discussed above.[5]

Accordingly, the Court grants summary judgment as to Plaintiff's disability discrimination claim.

## Retaliation

Plaintiff alleges that Defendant violated the ADA by retaliating against him in response to the accommodation request related to his wrist injury. (Compl. ¶ 31, ECF No. 1 at Pg. ID 4; ECF No. 45 at Pg. ID 1619-27.)

A plaintiff may demonstrate a *prima facie* case of retaliation by showing: "(1) that plaintiff engaged in a protected activity; (2) that the defendant had knowledge of plaintiff's protected conduct; (3) that the defendant took an adverse

---

[5] To the extent that Plaintiff contends that a lack of complaints from prior managers suggests pretext (*see* ECF No. 45 at Pg. ID 1602-03), this argument is unavailing because "positive performance review[s]" do not demonstrate pretext where they "occur[] prior to the events that [the defendant] proffers as justification for [the adverse action]." *Michael v. Caterpillar Fin. Servs. Corp*., 496 F.3d 584, 597 (6th Cir. 2007).

employment action towards plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002) (citation omitted). Retaliation claims, like intentional discrimination claims under the ADA, are analyzed under the *McDonnell Douglas* burden shifting framework. *Ladd v. Grand Trunk W.R.R., Inc*., 552 F.3d 495, 502 (6th Cir. 2009).

As with Plaintiff's discrimination claim, the Court need not address whether Plaintiff establishes a prima face case of retaliation because he has failed to create a genuine issue of material fact as to pretext. Plaintiff's arguments regarding pretext as to his retaliation claim are indistinguishable from his arguments regarding pretext as to his disability discrimination claim. (*See* Resp. Br., ECF No. 45 at Pg. ID 1623-27.) Because, as explained above, no reasonable factfinder could conclude that Defendant made up its stated reason in order to conceal intentional disability discrimination, Defendant is entitled to summary judgment on Plaintiff's retaliation claim as well. *See Chen*, 580 F.3d at 402.

## CONCLUSION

For the foregoing reasons, the Court finds that summary judgment is appropriate as to Plaintiff's claims of disability discrimination and retaliation.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 39) is **GRANTED**.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: September 30, 2021